UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel*. JOHN DOE,<br><br>  Plaintiff,<br><br>v.<br><br>RAYTHEON CO.; RAYTHEON<br>TECHNOLOGIES CORP. A/K/A UNITED<br>TECHNOLOGIES CORP.; RAYTHEON<br>CYBER SOLUTIONS, INC.,<br><br>  Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO.  21-CV-02343-JMC<br><br>RELATOR JOHN DOE'S<br>AMENDED COMPLAINT<br><br><u>FILED UNDER SEAL</u><br>PURSUANT TO 31 U.S.C. §<br>3730(b)(2).<br><br><u>JURY TRIAL DEMANDED</u> |

**<u>RELATOR JOHN DOE'S AMENDED COMPLAINT</u>**



RECEIVED

OCT 25 2024
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

**TABLE OF CONTENTS**

I. Introduction to Case ....................................................................................................1

II. Jurisdiction and Venue ................................................................................................3

III. Introduction to Relator ...............................................................................................3

    A. Background on Relator John Doe ....................................................................3

    B. Original Source and Disclosures....................................................................10

IV. Introduction to Raytheon Defendants ......................................................................11

V. Respondeat Superior and Vicarious Liability .........................................................12

VI. Federal Acquisition Regulation ("FAR") and its Supplements ............................12

    A. Overview.........................................................................................................12

    B. FAR Clause ....................................................................................................13

    C. DFARS Clause...............................................................................................14

    D. NIST Special Publication 800-171 ...............................................................16

    E. Allowable Costs .............................................................................................17

    F. Contractor Responsibilities............................................................................18

    G. Submission of Claims to the Government .....................................................18

    H. Contractor Certifications................................................................................19

    I. Consequences of Noncompliance ..................................................................19

VII. Defendants' Fraudulent Scheme ..............................................................................20

    A. Raytheon's culture of noncompliance caused fraud on DoD. .......................21

        1. Favoritism enabled fraud. ..................................................................21

        2. Employees who pushed back against noncompliance were punished or criticized..............................................................................................22

        3. Lax supervision resulted in serious security incidents that were never reported. ..............................................................................................22

**B.** DarkNet was not kept compartmentalized, in violation of FAR and DFARS.......24

**C.** DarkNet was compromised....................................................................................25

    **1.** Pirated and unlicensed software was used in DarkNet for years. ..............25

    **2.** Raytheon failed to properly control access levels and monitor user actions. ....................................................................................................................26

**D.** Defendants made or caused the making of false certifications and false records..27

**E.** Defendants fraudulently induced the United States DoD to enter into and renew its contracts with Raytheon. ................................................................................28

**F.** Defendants charged non-contract costs to Raytheon's contracts with DoD, in violation of FAR. .................................................................................................29

**VIII.** Retaliation Against Relator.................................................................................................30

**IX.** Actionable Conduct by Defendants ...................................................................................39

**A.** False Claims Act .................................................................................................39

    **1.** Applicable Law ......................................................................................39

    **2.** Defendants' Violations of the False Claims Act......................................41

        **a.** Presentment or Causation of Presentment of False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A)) .............................41

        **b.** Making or Using False Records or Statements Material to False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) ..................43

        **c.** Retaliation Against Relator (31 U.S.C. § 3730(h)) .........................44

**X.** Causes of Action.................................................................................................................45

**A.** Count I – Presentation of False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))..................................................................................................45

**B.** Count II – Making or Using False Records or Statements Material to False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B)) .....................................46

**C.** Count III – Retaliation (31 U.S.C. § 3730(h)) .......................................................47

**XI.**    Demand for Jury Trial....................................................................................................48

**XII.**    Index of Exhibits.........................................................................................................48

1.      On behalf of the United States of America, and on his own behalf, Plaintiff-Relator John Doe ("Relator") brings this action pursuant to the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732. Relator seeks to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and on his own behalf, and would respectfully show the following:

## I.      Introduction to Case

2.      The United States Department of Defense ("DoD") contracted Defendants Raytheon Company, Raytheon Cyber Solutions, Inc., and Raytheon Technologies Corporation (collectively, "Raytheon" or "Defendants") to provide specialized "cyber offense" capabilities and services. Raytheon's work under these contracts enables DoD to conduct crucial surveillance, intelligence gathering, and research that helps ensure the United States' national security, especially when it comes to cyber threats.

3.      Raytheon unfortunately did not treat its contractual duties to the United States with the gravity and security-consciousness required by federal regulations. A culture of noncompliance, favoritism, and indifference to security issues flourished within Raytheon. Individual 1, Individual 2, and Individual 3 were the three employees most responsible for Raytheon's culture of noncompliance. These three individuals and Raytheon's management (including Individual 4 and Individual 5) repeatedly ignored serious warning signs that Raytheon's systems were compromised and materially in violation of federal regulations. Defendants' utter failure to oversee and correct these issues resulted in deliberate false representations of compliance and capability that fraudulently induced DoD to enter into and renew their contracts with Raytheon.

4.      DoD would never have contracted with Raytheon had it known of Raytheon's noncompliance with required cybersecurity regulations. DoD refused Raytheon's repeated

1

requests for a "waiver clause" to allow noncompliance with those very regulations. Instead of admitting the truth about its systems, Raytheon instead chose to deliberately misrepresent itself as compliant.

5.      This practice is exemplified by a February 18, 2020 e-mail chain in which Individual 1 instructed an employee to lie about Raytheon's regulatory compliance instead of requesting a compliance waiver from DoD. *See* Ex. 1, E-mail between Relator, Individual 1, and Others (Feb. 18, 2020), at 1–2.

6.      Furthermore, Defendants fraudulently committed material breaches of Raytheon's existing contracts with DoD by failing to adhere to security-critical regulations and deliberately concealing those failures. Defendants also charged employees' non-contract-related performance evaluation time to Raytheon's DoD contracts, in violation of applicable regulations.

7.      Relator began working at Raytheon Co. in June of 2019 as Special Assistant to the Vice President of the CODEX division. Relator was promoted to Director of Engineering later that same year. Relator became aware of serious compliance deficiencies and spotted the warning signs of ongoing and future fraud not long after that in early 2020. Relator repeatedly reported these issues to Individual 1, Individual 2, Individual 3, and Raytheon's management, contract department, and ethics department, in an effort to stop fraud on the United States. Relator's reports of fraud were addressed slowly and only in part. Once Raytheon began to fix the most critical deficiencies of its internal network ("DarkNet") by creating a new compliant version, instead of thanking Relator, Defendants punished him. Relator was forced to relocate, his earnings were reduced, and his "new" position never actually materialized, essentially forcing him to resign.

8.      Defendants also misrepresented Raytheon's past fraud to DoD, claiming that the new, allegedly-compliant DarkNet would be ready around September of 2020. Defendants never

revealed to DoD that the new DarkNet didn't fully come online until March of 2021. Defendants also failed to tell DoD that the new DarkNet was only used for some contracts. Other contracts' work is still **knowingly performed on a noncompliant and unsecure network** to this day.

9. Defendants' fraudulent scheme caused DoD to pay tens of billions of dollars that it would not have paid had it known that Raytheon was noncompliant with a multitude of material cybersecurity regulations. Even worse, Defendants' practices put confidential government information at risk, including information that could affect the United States' national security. Because Defendants failed to adequately monitor Raytheon's systems for security breaches and other misconduct, the true impact of this risk may never be known until it is too late.

## II. Jurisdiction and Venue

10. Jurisdiction and venue are proper in the District of Columbia pursuant to the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the District of Columbia. Defendants engage in business in and/or are located in the District of Columbia, and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

## III. Introduction to Relator

### A. Background on Relator John Doe

11. Relator holds an M.S. in Electrical Engineering from Oklahoma State University and a B.S. in Applied Physics from the Georgia Institute of Technology. Relator worked for the United States' National Security Agency ("NSA") for thirty years, overseeing a variety of intelligence collection and security research projects.

12.     Relator began working for Defendant Raytheon Co. in June of 2019, initially as a Special Assistant to the Vice President of Raytheon's CODEX Division. In the last two months of 2019, Relator became the Director of Engineering.

13.     Raytheon's research and development work for the contracts at issue is performed on an internal development network called "DarkNet." DarkNet must kept compartmentalized—separate from other systems and the Internet—because of the sensitive work being done and the potential for threats to spread to other systems. DarkNet must also comply with certain federal regulations for cybersecurity under Raytheon's contracts.

14.     On January 27, 2020, Relator participated in a teleconference with Individual 2, Individual 6, and Individual 7. Relator learned that DarkNet was noncompliant with the regulations implementing guidance from National Institute of Standards and Technology publication 800-171 ("NIST 800-171"), as required by its contracts with DoD. Relator learned that in Spring 2017, Raytheon CODEX had proposed—and DoD had rejected—a contractual clause that would exempt Raytheon from compliance with the regulations implementing NIST 800-171. Individual 2 was dismissive of the importance of and need for compliance and claimed, incredibly, that the regulations were inapplicable. Relator learned that the compliance issue had been raised by others before, and discussed with Individual 3.

15.     That same evening, Relator spoke with Individual 4 about the teleconference. This conversation solidified Relator's understanding that Raytheon had not only failed to comply with the applicable regulations for years, but had actively dismissed compliance concerns raised by Individual 6 and others.

16.     On January 28, 2020, Relator e-mailed Individual 4 to follow up on this conversation:

4

[Individual 6] mentioned after the conversation that [Individual 2] knew we were not compliant and [Individual 2] told him previously that we didn't need to worry about it. . . . Given that more and more of our work will be on the DoD side **we need to press harder to become compliant** and not just be concerned about the contracts we currently have in place. . . .

I am extremely concerned that two of our key leaders [Individual 2 and Individual 3] are resistant to change and this makes it even more difficult for me to do my job. This passive aggressive behavior . . . still exists and is further promulgating entitled, and even troublesome, behavior.

I certainly recognize that being in compliance with our customer requirements is costly and viewed as a hindrance to performance **but aren't we legally liable to the contract terms**. . . .

I recommend a meeting . . . with you to discuss the way ahead.

Ex. 2, E-mail between Relator and Individual 4 (Jan. 28, 2020), at 1–2 (emphasis added). In short, after learning that compliance was deficient and that Raytheon was not performing as required by its federal contracts, Relator initiated efforts to remedy the situation.

17.    Around this time, Relator learned that Raytheon was creating a new, compliant version of DarkNet called "DarkNet 2.0." An allegedly-compliant "bridge" network called "DFARS Net" was to be used in the meantime, but was never deployed universally. Relator only learned later that, until the transition to DarkNet 2.0 was completed (in March 2021), Raytheon **was consistently and materially noncompliant** with NIST 800-171 and FAR/DFARS, despite certifying its compliance to DoD. Furthermore, only a subset of contracts transitioned to DFARS Net and later to DarkNet 2.0, meaning that **Raytheon's noncompliance continues to this day**.

18.    In early February of 2020, Individual 1, Individual 2, and Individual 3 again requested contractual clauses that would exempt Raytheon from compliance with cybersecurity regulations implementing NIST 800-171. DoD refused the "waiver clause" again. Individual 1 directed Individual 7 to sign the contract and certify Raytheon's compliance, even though Raytheon was clearly not compliant.

19.    On February 18, 2020, as part of preparation for a new federal contract, some proposed language for such a waiver clause was circulated via e-mail to Relator, Individual 1,

5

Individual 8, and Individual 9. *See* Ex. 1, E-mail between Relator, Individual 1, and Others (Feb. 18, 2020). In this e-mail chain, Individual 10 inquired whether he should seek a compliance waiver, given that DoD would likely reject it. *See* Ex. 1, at 2. Individual 1 responded, "Insert that our IT system is compliant[.] Don['t] take an exception." Ex. 1, at 1. In short, Individual 1 told Individual 10 to lie about Raytheon's compliance. Relator replied, "How can we ethically do the following as stated below 'Insert that our IT system is compliant[.]'" *Id.*

20.     Relator learned around this time that Raytheon not only had previously lied to DoD about its ability to provide compliant systems, but had never reported its noncompliance to DoD. Bit by bit, he gradually understood that Individual 1, Individual 2, and Individual 3 had actively suppressed noncompliance, claiming that NIST 800-171 didn't apply to Raytheon. Most Raytheon employees working underneath Individual 1, Individual 2, and Individual 3 did not have the technical knowledge to know that this was false, so the fraud had continued unabated for some time. To make things worse, Individual 1, Individual 3, and Individual 2's superior, Individual 5, knew of or ignored their conduct, and failed to discipline them or permit others to do so.

21.     Around this time, Relator learned from the Individual 7 that Raytheon was charging time its employees spent on non-contract-related tasks like performance evaluations and training as direct project time on DoD contracts, in violation of applicable regulations. The practice had continued for years under Individual 1's guidance. Individual 1 told Relator that the practice was compliant because it benefitted the contracts' projects. Relator confirmed with Raytheon's financial and contract departments that the practice was impermissible. Relator conveyed this information to Raytheon employees and worked to correct the prior year's time records.

22.     On April 9, 2020, Individual 3 e-mailed Relator, Individual 6, and Individual 7, stating that Raytheon would not follow an "'everything-must-be-[compliant]' approach." Ex. 3,

E-mail regarding Castles Contract (Apr. 9–10, 2020), at 1. Individual 3 claimed that using Raytheon's existing, noncompliant DarkNet in combination with another system would suffice, and asked whether the "Castles" project really required a DFARS-compliant environment. *See id.* Individual 3 falsely claimed that his proposal had approval from Raytheon's legal team, contracts team, and CODEX leadership team. *Id.*

23.     On April 10, 2020, Relator forwarded Individual 3's message to Individual 4 and expressed concern that the CODEX leadership team had not been fully briefed on or approved Individual 3's proposal. *Id.* Individual 4 responded to Relator and dismissed his concerns: "I am comfortable with [Individual 3's] approach as I see no reason not to be comfortable." Ex. 3, at 1.

24.     On April 16, 2020, Relator had a group telephone call with Individual 7, Individual 6, Individual 9, Individual 3, and Individual 11. The group reached an understanding that DarkNet was non-compliant with the applicable regulations (and had no waiver for compliance, either). Ensuring compliance with proper administrative controls was discussed.

25.     Without any notice to Relator, in late May of 2020, Raytheon sent letters to its points of contact for the DoD contracts at issue, revealing DarkNet's noncompliance years after the fact:

> Based upon an initial review, we believe that the Darknet information system is not in compliance with [Federal Acquisition Regulation] 52.204-21.
> RCSI is committed to addressing this non-compliance. To that end, RCSI is in the process of developing a robust system environment, "Darknet 2.0," which will replace Darknet and will be designed to implement the NIST SP 800-171-based security requirements in the FAR clause. RCSI is currently focused on the timely implementation of Darknet 2.0 and is ready to discuss Darknet 2.0 status as well as certain interim measures being taken on the existing Darknet system. Based on the current projections, Darknet 2.0 is expected to be deployed in September 2020.

Ex. 4, Noncompliance Letter Example, at 1. At the time this letter was sent, there was no concrete plan in place for how to make a compliant DarkNet, nor was DarkNet 2.0 "expected to be deployed in September 2020." *Id.* Additionally, work on some of the contracts at issue *never* transitioned to

7

DarkNet 2.0 and remained on the noncompliant and unsecure DarkNet. As a result, Raytheon furthered its fraudulent scheme by sending this letter.

26.     Due to the COVID-19 pandemic, the May 2020 noncompliance letter was likely not reviewed by the necessary personnel at DoD until later in 2020, by which time DoD would have assumed that DarkNet 2.0 was deployed and the compliance issue had been remedied. Raytheon never disclosed to DoD during Relator's employment that the compliant DarkNet 2.0 was not fully deployed until March of 2021, and was not implemented universally.

27.     In mid-2020, Individual 2 verbally attacked Relator in front of Individual 4, blaming Relator for other employees' departure from Raytheon. Neither Relator nor any other Raytheon employee had any control over those departures.

28.     As part of the employee evaluation process, on June 16, 2020, Relator reported some of his concerns, noting his protected activity to date:

> [T]o grow requires that we operate not only in a functional manner but also with integrity. I discovered that our [Darknet] network was not compliant and immediately raised that concern to [Individual 4]. I was a significant player in identifying solutions to satisfy [regulatory] policies even at great risk to myself given backlash from several members of the CODEX [leadership team]. However, the resulting changes will be both functional and compliant.

Ex. 5, Relator's Employee Evaluations, at 5.

29.     On June 16, 2020, Relator learned that DarkNet was removed from merger and acquisition information at Raytheon, and was being operated "off the books." Many believed that this had been done deliberately in order to continue using a known noncompliant solution on DoD contracts, purposefully continuing Defendants' fraudulent scheme.

30.     On July 29, 2020, Relator learned that Individual 1, Individual 2, and Individual 3 had independently (with Individual 4's permission) developed a "strategic initiative to address CODEX Engineering issues" including "examining a revamp of the organization structure[.]" Ex.

8

6, E-mails between Relator, Individual 12, and Others (July 29–30, 2020), at 3. The proposed plan gave these three individuals more control and minimized Relator's involvement. Relator forwarded communications from Individual 1 to Individual 4 on July 30, 2020 (copying Individual 12) and expressed concern that Individual 1, Individual 2, and Individual 3 were trying to preserve a culture of noncompliance. *See* Ex. 6, at 1–2.

31. On July 31, 2020, Relator learned that Individual 4 had falsely told another Raytheon department lead that Relator wanted to transfer to his department. It appeared that Individual 4 wanted to transfer Relator as retaliation for reporting and trying to stop Raytheon's fraud.

32. On August 12, 2020, Individual 4 told Relator that he needed to leave Raytheon if he did not trust Individual 2. Individual 4 conveyed to Relator that Individual 2 was not responsible for Raytheon's noncompliance, but this was at odds with what Relator and other employees had both observed and reported for years.

33. On August 27, 2020, Relator e-mailed Raytheon's ethics department and reported Defendants' failure to address his and other employees' concerns that Individual 1, Individual 2, and Individual 3 had caused Raytheon's ongoing noncompliance with laws and regulations and promulgated a culture of noncompliance. Relator expressed concern that Individual 3 was put in charge of regulatory compliance even though he had intentionally evaded it in order to reduce the CODEX engineers' work. Relator also reported Individual 4's actions on August 12 as retaliation for his reports of and efforts to stop fraud.

34. In September of 2020, Individual 4 removed Relator as Raytheon CODEX Director of Engineering in order to punish him for his efforts to stop fraud on DoD. Relator accepted a

replacement position in Maryland. After relocating (and buying a new home), Relator never received the cost-of-living salary adjustment Raytheon promised him in return.

35.    When Relator came to Raytheon's Maryland office in December of 2020, he learned that the new contracts he was expected to work under had never materialized. In fact, Individual 4 had never even confirmed with Human Resources which new position Relator would assume. It became increasingly apparent to Relator that he had been discriminated against in the terms and conditions of employment, as he waited for a future work that never came.

36.    On December 18, 2020, Relator completed a year-end self-assessment as part of the employee evaluation process. *See* Ex. 5, Relator's Employee Evaluations, at 5–6. He noted that he had "[s]pent significant energy and time responding to numerous ethics complaints directed outside of engineering" and had encouraged the DarkNet 2.0 team to add additional time to their estimates of when that system would be ready. Ex. 5, at 5. However, Raytheon never corrected its false statement to DoD that DarkNet 2.0 would be ready by September of 2020. DarkNet 2.0 did not go online and become fully compliant until March of 2021, and some contracts' work never transitioned out of the original DarkNet. Meanwhile, DoD believed that Raytheon had fixed its noncompliance issue completely many months prior.

37.    Relator resigned from Raytheon Co. not too long afterwards, feeling that he had essentially been forced out for his reports of and efforts to stop fraud. Individual 1, Individual 2, Individual 3, Individual 4, and Individual 5 remained, along with Raytheon's widespread culture of noncompliance that permitted continued fraud and ignored serious potential threats to national security.

**B.    Original Source and Disclosures**

38.    There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. Relator has direct and independent knowledge of

the information on which his allegations are based. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and provided this information to the United States prior to filing a complaint by submitting a voluntary Pre-filing Disclosure Statement.

39.     As required pursuant to 31 U.S.C. § 3730(b) and (e), Relator will submit an original disclosure statement to the Attorney General of the United States and the United States Attorney for the District of Columbia contemporaneously with service of the Original Complaint.

### IV.     Introduction to Raytheon Defendants

40.     Defendant Raytheon Company is a Delaware corporation that does business nationwide. It is headquartered at 807 Winter Street, Waltham, Massachusetts 02451. Raytheon Co. is publicly-traded on the New York Stock Exchange under the ticker symbol "RTX." It may be served through its registered agent, CT Corporation System, at 1015 15th Street Northwest, Suite 100, Washington, DC 20005.

41.     Defendant Raytheon Technologies Corp., also known as United Technologies Corp., is a Delaware corporation that does business nationwide. It is headquartered at 807 Winter Street, Waltham, Massachusetts 02451. Raytheon Technologies Corp. may be served through its registered agent, CT Corporation System, at 1015 15th Street Northwest, Suite 100, Washington, DC 20005.

42.     Defendant Raytheon Cyber Solutions, Inc. is a Florida corporation that conducts business nationwide. Its principal place of business is located at 1220 North Highway A1A, Suite 123, Indialantic, Florida 32903. It may be served through its registered agent, CT Corporation System, at 1200 South Pine Island Road, Plantation, Florida 33324.

11

43.     Unless otherwise specified, Raytheon Co., Raytheon Technologies Corp., and Raytheon Cyber Solutions, Inc. will be collectively referred to hereinafter as "Raytheon."

## V.     Respondeat Superior and Vicarious Liability

44.     Any and all acts alleged herein to have been committed by Raytheon were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of Raytheon and within the course and scope of their employment, or by corporate predecessors to whom successive liability applies.

45.     Defendants Raytheon Co., Raytheon Technologies Corp., and Raytheon Cyber Solutions, Inc. are related entities sharing common employees, offices, resources, and business names such that they are jointly and severally liable. Further, the past, present and continuing relations and dealings by and between these related entities are so inextricably intertwined that for purposes of this suit, they should be considered as a single entity at law and equity.

## VI.     Federal Acquisition Regulation ("FAR") and its Supplements

A.     Overview

46.     The Federal Acquisition Regulation ("FAR") is a system of regulations jointly issued by DoD, the U.S. General Services Administration, and the National Aeronautics and Space Administration for use in acquiring goods and services in a uniform manner for federal contracts. The FAR is codified in Title 48 of the United States Code of Federal Regulations.

47.     The Defense Federal Acquisition Regulation Supplement ("DFARS") is a system of regulations administered by the Department of Defense for the purpose of implementing and supplementing the FAR. DFARS establishes delegations of FAR authorities, deviations from FAR requirements, and DoD-wide policies. It should be read in conjunction with the primary set of rules in FAR.

**B.      FAR Clause**

48.      All of the contracts at issue in this case contain and require compliance with the following clause, as required by FAR since June 15, 2016, in relevant part:

The Contractor shall apply the following basic safeguarding requirements and procedures to protect covered contractor information systems. Requirements and procedures for basic safeguarding of covered contractor information systems shall include, at a minimum, the following security controls:

(i)      Limit information system access to authorized users, processes acting on behalf of authorized users, or devices (including other information systems).

(ii)      Limit information system access to the types of transactions and functions that authorized users are permitted to execute.

(iii)      Verify and control/limit connections to and use of external information systems.

(iv)      Control information posted or processed on publicly accessible information systems.

(v)      Identify information system users, processes acting on behalf of users, or devices.

(vi)      Authenticate (or verify) the identities of those users, processes, or devices, as a prerequisite to allowing access to organizational information systems.

(vii)      Sanitize or destroy information system media containing Federal Contract Information before disposal or release for reuse.

(viii)      Limit physical access to organizational information systems, equipment, and the respective operating environments to authorized individuals.

(ix)      Escort visitors and monitor visitor activity; maintain audit logs of physical access; and control and manage physical access devices.

(x)      Monitor, control, and protect organizational communications (i.e., information transmitted or received by organizational information systems) at the external boundaries and key internal boundaries of the information systems.

(xi)      Implement subnetworks for publicly accessible system components that are physically or logically separated from internal networks.

(xii)      Identify, report, and correct information and information system flaws in a timely manner.

(xiii)      Provide protection from malicious code at appropriate locations within organizational information systems.

(xiv)      Update malicious code protection mechanisms when new releases are available.

(xv)      Perform periodic scans of the information system and real-time scans of files from external sources as files are downloaded, opened, or executed.

48 C.F.R. § 52.204-21(b)(1). "Covered contractor information system" is defined as "an information system that is owned or operated by a contractor that processes, stores, or transmits

13

Federal contract information." 48 C.F.R. § 52.204-21(a). "Safeguarding means measures or controls that are prescribed to protect information systems." *Id.*

## C. DFARS Clause

49. As required by DFARS, every contract at issue in this case contains and requires compliance with 48 C.F.R. § 252.204-7012, reproduced below in relevant part:

(b) *Adequate security.* The Contractor shall provide adequate security on all covered contractor information systems. To provide adequate security, the Contractor shall implement, at a minimum, the following information security protections: . . .

(2) For covered contractor information systems that are not part of an IT service or system operated on behalf of the Government and therefore are not subject to the security requirement specified at paragraph (b)(1) of this clause, the following security requirements apply:

(i) Except as provided in paragraph (b)(2)(ii) of this clause, the covered contractor information system shall be subject to the security requirements in National Institute of Standards and Technology (NIST) Special Publication (SP) 800-171, "Protecting Controlled Unclassified Information in Nonfederal Information Systems and Organizations" . . .

(ii) (A) The Contractor shall implement NIST SP 800-171, as soon as practical, but not later than December 31, 2017. For all contracts awarded prior to October 1, 2017, the Contractor shall notify the DoD Chief Information Officer (CIO), via email . . . within 30 days of contract award, of any security requirements specified by NIST SP 800-171 not implemented at the time of contract award.

(B) The Contractor shall submit requests to vary from NIST SP 800-171 in writing to the Contracting Officer, for consideration by the DoD CIO. The Contractor need not implement any security requirement adjudicated by an authorized representative of the DoD CIO to be nonapplicable or to have an alternative, but equally effective, security measure that may be implemented in its place.

(C) If the DoD CIO has previously adjudicated the contractor's requests indicating that a requirement is not applicable or that an alternative security measure is equally effective, a copy of that approval shall be provided to the Contracting Officer when requesting its recognition under this contract. . . .

(3) Apply other information systems security measures when the Contractor reasonably determines that information systems security measures, in addition to those identified in paragraphs (b)(1) and (2) of this clause, may be required to provide adequate security in a dynamic environment or to accommodate special circumstances (e.g., medical devices) and any individual, isolated, or

14

temporary deficiencies based on an assessed risk or vulnerability. These measures
may be addressed in a system security plan.
(c)      *Cyber incident reporting requirement.*
   (1)      When the Contractor discovers a cyber incident[1] that affects a
covered contractor information system or the covered defense information residing
therein
. . . the Contractor shall -
      (i)   Conduct a review for evidence of compromise of covered
      defense information, including, but not limited to, identifying compromised
      computers, servers, specific data, and user accounts. This review shall also
      include analyzing covered contractor information system(s) that were part
      of the cyber incident, as well as other information systems on the
      Contractor's network(s), that may have been accessed as a result of the
      incident in order to identify compromised covered defense information . . .
      and
      (ii)  Rapidly report cyber incidents to DoD[.] . . .

48 C.F.R. §§ 252.204-7012(b)–(c). Identical requirements have been in place since October 21,

2016. *Compare id. with* 48 C.F.R. § 252.204-7012 (2016).

   50.      "Adequate security" is defined as "protective measures that are commensurate with

the consequences and probability of loss, misuse, or unauthorized access to, or modification of

information." 48 C.F.R. § 252.204-7012(a).

   51.      "Compromise" is defined as "disclosure of information to unauthorized intentional

or unintentional disclosure, modification, destruction, or loss of an object, or the copying of

information to unauthorized media may have occurred. 48 C.F.R. § 252.204-7012(a).

   52.      "Covered contractor information system" is defined as "an unclassified information

system that is owned, or operated by or for, a contractor and that processes, stores, or transmits

covered defense information." *Id.*

   53.      "Covered defense information" (often abbreviated "CDI") is defined as:

   unclassified controlled technical information or other information, as described in
   the Controlled Unclassified Information (CUI) Registry . . . that requires

---

[1] "Cyber incident means actions taken through the use of computer networks that result in a compromise or an actual
or potentially adverse effect on an information system and/or the information residing therein." 48 C.F.R. § 252.204-
7012(a).

safeguarding or dissemination controls pursuant to and consistent with law, regulations, and Governmentwide policies, and is—

(1)     Marked or otherwise identified in the contract, task order, or delivery order and provided to the contractor by or on behalf of DoD in support of the performance of the contract; or

(2)     Collected, developed, received, transmitted, used, or stored by or on behalf of the contractor in support of the performance of the contract.

48 C.F.R § 252.204-7012(a).

**D.     NIST Special Publication 800-171**

54.     As noted above, DFARS requires Raytheon's information systems to comply with National Institute of Standards and Technology ("NIST") Special Publication 800-171. *See* 48 C.F.R. § 252.204-7012(b)(2). Several NIST 800-171 requirements are exactly equivalent to those in 48 C.F.R. § 52.204-21(b). DoD Instruction 8582.01 (Dec. 9, 2019) § 3.2.[2] NIST 800-171 also recommends, in relevant part:

- Employing "the principle of least privilege," which includes limiting "system administrator accounts" or "super user accounts" to specific roles in order to prevent "day-to-day users from having access to privileged information or functions." Ex. 7, NIST 800-171, § 3.1.5.

- Using accounts with high access privileges (i.e., system administrator accounts) only when necessary, and separating user functions from administrator functions. *See* Ex. 7 §§ 3.1.5, 3.1.6, 3.1.7, 3.13.3. So, for example, someone with system administrator access might also be given a non-administrator account to use for day-to-day functions. *Id.*

- Prevent and log instances of users without high access privileges executing privileged functions, because "[m]issue of privileged functions, either intentionally or unintentionally by authorized users, or by unauthorized external entities [with] compromised system accounts, is a serious and ongoing concern and can have significant adverse impacts on organizations." Ex. 7 § 3.1.7.

- Limiting connection of external systems, portable storage devices, removable media, and personal devices to the system at issue. *See* Ex. 7 §§ 3.1.18, 3.1.20, 3.1.21, 3.8.7, 3.8.9.

- Providing "security awareness training on recognizing and reporting potential indicators of insider threat." Ex. 7 § 3.2.3. These potential indicators can include:

---

[2] *Available at* https://fas.org/irp/doddir/dod/i8582_01.pdf

16

"attempts to gain access to information that is not required for job performance" and harassment of other employees. *Id.*

- Keeping "system audit logs and records" for "monitoring, analysis, investigation, and reporting of unlawful or unauthorized system activity." Ex. 7 § 3.3.1.

- Ensuring that individual user actions are traceable, so that individual users "can be held accountable for their actions." Ex. 7 § 3.3.2.

- Setting incident response procedures, including tracking, documenting, and reporting security incidents "to designated officials and/or authorities[.]" Ex. 7 §3.6.2. "Suspected security incidents may also be reported[.]" *Id.*

- Setting baseline configurations for hardware, software, and firmware. Ex. 7 § 3.4.1. This includes tracking information like software licenses, which is "deemed necessary for effective accountability of system components." *Id.* User-installed software must be monitored. Ex. 7 § 3.4.9.

- Physically controlling and securely storing paper and digital "system media" containing controlled information. Ex. 7 § 3.8.1. This includes external and removable hard disk drives. *Id.*

- Limiting access to controlled information to authorized users only, and controlling access to that information if it leaves a controlled area. *See* Ex. 7 §§ 3.8.2, 3.8.3, 3.8.5, 3.8.6.

- Preventing "unauthorized and unintended information transfer via shared system resources." Ex. 7 § 3.13.4.

- Preventing or controlling connection to outside networks or the Internet. *See* Ex. 7 §§ 3.13.6–3.13.9, 3.13.14.

- Identifying "unauthorized use of organizational systems" via regular system monitoring, including monitoring unusual activities or conditions related to inbound or outbound communications. Ex. 7 § 3.14.7; *see also* Ex. 7 §§ 3.14.1–3.14.6.

## E.    Allowable Costs

55.    A contractor can only charge costs to a contract under FAR if the costs are reasonable, allowable under the contract, and allocable to the contract. *See* 48 C.F.R. § 31.201-2(a). A cost that does not meet these three criteria is not allowed. Fraudulently billing the United States for a disallowable cost can constitute a false and/or fraudulent claim. *See, e.g., U.S. ex rel.*

17

*Reddell v. DynCorp Int'l, LLC*, No. 1:14-CV-86, 2019 WL 12875471, at \*9–\*10 (E.D. Tex. Mar. 20, 2019).

56.    Costs are "allocable" if they are "assignable or chargeable to one or more cost objectives" of a contract. 48 C.F.R. § 31.201-4. This requires that one of three criteria be met: (1) the cost is "incurred specifically for the contract"; (2) the cost benefits a contract and other work, and can be distributed to both "in reasonable proportion to the benefits received;" or (3) the cost is necessary for overall operation of the contractor's business, "although a direct relationship to any particular cost objective cannot be shown." *Id.* The "benefit" requirement is not read literally as anything which benefits the government; it instead necessitates showing a "nexus between the contractor's cost and the contractor's government work[.]" *Teknowledge Corp. v. U.S.*, 350 F. App'x 452, 455 (Fed. Cir. 2009) (citing *Boeing N. Am., Inc. v. Roche*, 298 F.3d 1274, 1284 (Fed. Cir. 2002)).

## F.    Contractor Responsibilities

57.    Pursuant to 48 C.F.R. § 46.105(a), the "contractor is responsible for carrying out its obligations under the contract by: (1) controlling the quality of supplies or services; and (2) Tendering to the Government for acceptance only those supplies or services that conform to contract requirements." Contractors are responsible for implementing "procedures and processes for services to ensure that services meet contract performance requirements." 48 C.F.R. § 46.105(c).

## G.    Submission of Claims to the Government

58.    Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. With the limited exception of interim payments on cost-reimbursement contracts for services, all invoice payments must be supported by a receiving report or any other Government documentation authorizing payment. 48 C.F.R. § 32.905(c).

18

Documentation must include, at a minimum, description of the supplies delivered, or services performed, and quantities of supplies received and accepted, or services performed. 48 C.F.R. § 32.905(c)(2) and (3).

59.    Pursuant to 48 C.F.R. § 32.007(a)(1), contract financing payments are due the thirtieth day after the designated billing office receives "a proper contract financing request." A proper contract financing request "must comply with the terms and conditions specified by the contract," and the contractor must correct any defects in requests submitted. 48 C.F.R. § 32.007(c).

**H.    Contractor Certifications**

60.    The general FAR invoice requires the contractor to certify that the voucher is proper. Specifically, Standard Form 1034 states, before the contractor's signature line: "I certify that this voucher is correct and proper for payment." 48 C.F.R. § 53.301-1034. By certifying that the voucher is proper for payment, the contractor certifies that the voucher is a good faith request for payment in accord with the contract.

61.    Contractors are also required to make the following certifications when submitting any claim exceeding $100,000: "I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor." *See* 48 C.F.R. § 33.207(c).

**I.    Consequences of Noncompliance**

62.    A contractor may be debarred if found liable for commission of fraud in connection with obtaining, attempting to obtain, or performing a public contract. *See* 48 C.F.R. § 9.406-2(a)(1). Furthermore, knowing failure by a principal to timely disclose to the Government credible evidence of a violation of the False Claims Act, or significant overpayments on the contract,

19

constitutes grounds for debarment. *See* 48 C.F.R. § 9.406-2(b)(1)(vi)(B) and (C). Moreover, the Government may reduce or suspend contract payments upon a finding of fraud. *See* 48 C.F.R. § 32.006-1(b).

### VII.    Defendants' Fraudulent Scheme

63.    The United States DoD entered into three master contracts with Raytheon for cyber offense capabilities and other related services, listed below. All contracts at issue in this matter were part of these master contracts.

| Contract Number | Effective Date(s) | Value to Date | Contracting Defendant |
|---|---|---|---|
| HQ072716D-0006 | 4/1/2016 to 3/31/2026 | Over $17.5 billion | Raytheon Co. |
| H9400304D-0006 | 12/15/2005 to present | Over $15 billion | Raytheon Co. |
| FA875018D-0005 | 4/12/2018 to present | Over $950 million | Raytheon Technologies |
| | Total Value to Date: | Over $33.45 billion | |

64.    Raytheon utterly failed to comply with cybersecurity procedures required by federal regulation. First, Defendants allowed a culture of noncompliance to permeate the Raytheon divisions at issue, punished or criticized those who sought to change it, and failed to prevent or report serious security incidents that resulted. Second, Defendants failed to keep Raytheon's internal development network DarkNet properly compartmentalized in accordance with the applicable regulations. Third, Defendants permitted use of pirated and unlicensed software within DarkNet for years, and failed to control DarkNet users' level of access, compromising DarkNet's security.

65.    Defendants' actions caused submission of false and/or fraudulent claims to the United States DoD. Defendants caused Raytheon to falsely certify its compliance with FAR and DFARS in order to induce and maintain DoD contracts, misled DoD about Raytheon's later efforts to remedy noncompliance (via false records and certifications), and caused the submission of direct false and/or fraudulent claims for unallowable time. DoD would never have contracted with

20

Raytheon or paid claims under the resulting contracts at issue had it known of this material noncompliance.

## A.    Raytheon's culture of noncompliance caused fraud on DoD.

### 1.    Favoritism enabled fraud.

66.    A culture of favoritism and indifference towards noncompliance permeated the divisions of Raytheon at issue in this matter. Individual 5 allowed his three favored employees to essentially do as they pleased without correction or punishment, despite a history of disobedience and noncompliance. These employees were Individual 1, Individual 2, and Individual 3, who Relator referred to as the "three [individuals]".

67.    Individual 4 recognized that the "three [individuals]"—and Individual 5's favoritism towards them—were causing violations of the contracts and regulations at issue. Individual 4 never disciplined or terminated the "three [individuals]" despite multiple warnings from Relator and others that their conduct could cause Raytheon to commit fraud.

68.    The "three [individuals]" perpetuated a false belief within Raytheon that NIST 800-171, FAR, and DFARS did not apply, and that any rule not specifically enumerated in the contracts at issue was inapplicable. This ignores the fact that Raytheon's contracts required it to certify compliance with NIST 800-171 and to comply with all applicable laws and regulations. Most employees who worked under the "three [individuals]" lacked the technical and legal knowledge to realize this was the case.

69.    This unfortunately was not merely a favoritism and mismanagement issue. Individual 4 and Individual 5's inaction and negligence concerning the "three [individuals]" resulted in fraud on the United States. The noncompliance that this culture fostered, explained further *infra* throughout this section, caused Raytheon to falsely certify its compliance with the

21

FAR and DFARS regulations interpreting NIST 800-171's requirements while knowing that its systems were not capable of compliance.

**2.    Employees who pushed back against noncompliance were punished or criticized.**

70.    Defendants pushed back against employees who sought to remedy the noncompliance the "three [individuals]" fostered.

71.    For example, in June of 2019 when Individual 6 brought up noncompliance issues, he was labeled a "troublemaker."

72.    In late summer of 2019, Individual 4 sought to terminate Individual 9's employment after she raised compliance issues.

73.    Around November 21, 2019, Individual 4 and Individual 5 resisted change when they were informed that NIST 800-171 compliance was required, on the basis that Raytheon would supposedly lose engineers if it had to comply.

74.    Additionally, as explained further in this complaint, Defendant Raytheon Co. retaliated against Relator for his reports of and efforts to stop fraud.

**3.    Lax supervision resulted in serious security incidents that were never reported.**

75.    Defendants' lax supervision of employees, contractual compliance, and security requirements led to serious incidents beyond Individual 1, Individual 2, and Individual 3. The following incidents not only materially violate the contracts at issue but also could have compromised the security of Raytheon's confidential work—or worse, threatened the U.S.'s national security.

(a) In the Spring of 2019, a Raytheon employee in Greenville, South Carolina was intercepted while removing a hard drive from the office. Individual 5 "buried" the incident instead of reporting it to the United States. This violates FAR and its incorporation into the contracts at issue. *See* 48 C.F.R. §§ 52.204-21(b)(1)(vii)–(ix). It

22

also violates DFARS because it does not follow NIST 800-171's rules for controlling and securing system media and incident response procedures. *See* 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.6.2, 3.8.1, 3.8.5.

(b) In June of 2019, an employee in Raytheon's San Antonio, Texas office copied proprietary data onto a personal flash drive in order to take to a customer. The employee lost the drive, putting sensitive data at risk that never should have been taken offsite. The incident, to Relator's knowledge, was never reported to the United States. This incident and the failure to report it violated DFARS. *See* 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.21, 3.6.2, 3.8.3, 3.8.5, 3.8.7.

(c) In October of 2019, several Raytheon engineers downloaded classified, "leaked" information from the Internet and loaded it onto DarkNet. This conduct is obviously impermissible to anyone with a required security clearance like these engineers, and also violates FAR and DFARS. *See* 48 C.F.R. §§ 52.204-21(b)(1)(iii), (iv), (x); 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.20, 3.13.4, 3.13.6, 3.14.7.

(d) In late September of 2020, several Raytheon engineers downloaded source code from DarkNet and hid it, concerned that they had violated another company's trade secrets and that it might be discovered. Messages exchanged between the engineers said "no snitching" and "don't let police in." This type of conduct is prohibited by DFARS. *See* 48 C.F.R. § 252.204-7012(b); Ex. 7, NIST 800-171 §§ 3.13.4, 3.14.6, 3.14.7.

Relator learned of these incidents in 2020 as part of his investigation of and efforts to prevent fraud on DoD. Defendants' prior failure to report these incidents violated DFARS' "cyber incident" rules, which require informing DoD about any actions causing compromise or actual or potential

23

adverse effects on information systems or the information residing therein. 48 C.F.R. §§ 252.204-7012(a), (c).

76.    As explained further *infra*, Defendants' violations of FAR and DFARS noted above resulted in the submission of false and/or fraudulent claims for payment because Raytheon certified its compliance with those regulations.

**B.    DarkNet was not kept compartmentalized, in violation of FAR and DFARS.**

77.    Raytheon's research and development work for the contracts at issue is mainly performed on an internal network called "DarkNet." The work performed in DarkNet contributes to the capabilities of some of the U.S. Government's most sensitive information systems.

78.    Raytheon's research in DarkNet sometimes includes intentionally activating a virus or malicious code, for example, in order to analyze it. Because of the sensitive work being done and the potential for these threats to spread to other systems, FAR and DFARS required that DarkNet be kept compartmentalized—separate from other systems, devices, and the Internet. *See* 48 C.F.R. §§ 52.204-21(b)(1)(iii), (x), (xi); 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.18, 3.1.20, 3.1.21, 3.8.7, 3.8.9, 3.13.6–3.13.9. However, DarkNet was never kept compartmentalized as required.

79.    First, DarkNet was periodically connected to the Internet, external devices, or personal drives by Raytheon employees. Some of these incidents may have been unintentional. The issue was worsened because: (1) Raytheon had few internal documented rules for these connections; and (2) the rules were ignored due to Raytheon's culture of noncompliance. Some foreign governments which are hostile to the United States issue "bounties," incentivizing hackers to target systems like DarkNet in search of sensitive information. Connection to the Internet makes this kind of hacking possible.

24

80.     Second, these issues were not spotted and remedied in a timely manner, because DarkNet did not have the 24/7 system monitoring required by FAR and DFARS. *See* 48 C.F.R. §§ 52.204-21(b)(1)(xii), (xv); 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.7, 3.3.1, 3.3.2, 3.14.1–3.14.7. The possibility of malicious hacking via the Internet is especially concerning because Defendants' failure to monitor would not have detected any intrusion.

81.     Much of the work conducted in DarkNet was transitioned onto a compliant system referred to as "DarkNet 2.0" by March of 2021. Some work was also temporarily performed on a compliant "bridge" system called "DFARS Net" in 2020. To this day, however, Raytheon still conducts some work for the contracts at issue in the original DarkNet, despite its noncompliance.

82.     As explained further *infra*, Defendants' violations of FAR and DFARS noted above resulted in the submission of false and/or fraudulent claims for payment because Raytheon certified its compliance with those regulations.

## C.     DarkNet was compromised.

### 1.    Pirated and unlicensed software was used in DarkNet for years.

83.     Defendants allowed unlicensed and pirated software to be used within "DarkNet" in violation of FAR and DFARS. *See* 48 C.F.R. §§ 52.204-21(b)(1)(xii)–(xv); 48 C.F.R. § 252.204-7012(b); Ex. 7, NIST 800-171 §§ 3.4.1, 3.4.9. Pirated software not only violates FAR and DFARS, but it can contain malicious code, viruses, or other threats that could put confidential national security-related data at risk.

84.     Due to lax oversight by Defendants, Raytheon used unlicensed and pirated versions of certain software in DarkNet. Shockingly, DarkNet lacked minimum security procedures of any kind, which would typically prevent this kind of misconduct. DarkNet's lack of round-the-clock

25

monitoring (a violation of FAR and DFARS)[3] also exacerbated the issue, which was not remedied until years after it began.

85.      On March 9, 2020, after years of noncompliant use of pirated and unlicensed software within DarkNet, a "baseline" rule for unlicensed and pirated software monitoring was finally established (as required by FAR and DFARS) and unlicensed software was removed. But in the meantime, highly confidential information could have been compromised without Raytheon's knowledge, due to the lack of monitoring.

**2.    Raytheon failed to properly control access levels and monitor user actions.**

86.      All employees using DarkNet had "admin" (administrator) level access, and their activities were not monitored. Because one bad actor can access and potentially compromise everything, DFARS requires adherence to the principal of "least privilege," only giving employees the access level their work requires. *See* 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.5–3.1.7, 3.13.3.

87.      Some disgruntled Raytheon engineers abused Defendants' failure to enforce "least privilege." For example, they used their unlimited "admin" level privileges to play a "prank" within DarkNet, usurping Individual 4's account and masquerading as her. Raytheon's failure to trace and monitor user actions (as required by FAR and DFARS)[4] resulted in this prank going unpunished. DFARS also requires security training, which would flag this kind of misconduct as a potential indicator of "insider threat." Ex. 7 § 3.2.3; *and see* 48 C.F.R. § 252.204-7012(b)(2). Without proper tracing and monitoring, however, the potential threat could not be investigated further.

---

[3] *See* 48 C.F.R. §§ 52.204-21(b)(1)(xii), (xv); 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.7, 3.3.1, 3.3.2, 3.14.1–3.14.7.
[4] *See* 48 C.F.R. §§ 52.204-21(b)(1)(v), (vi), (x); 48 C.F.R. § 252.204-7012(b)(2); Ex. 7, NIST 800-171 §§ 3.1.7, 3.3.1, 3.3.2, 3.14.7.

26

88.     DFARS is clear that Raytheon needed to implement all protective measures appropriate for DarkNet in order to provide "adequate security." *See* 48 C.F.R. §§ 252.204-7012(a), (b). But DarkNet lacked even minimum security procedures. This extended to failures as basic as not having anti-virus software. Defendants' aforementioned lack of 24/7 monitoring exacerbated the problem because breaches may not have been detected in a timely fashion—or at all.

89.     As explained further *infra*, Defendants' violations of FAR and DFARS noted above resulted in the submission of false and/or fraudulent claims for payment because Raytheon certified its compliance with those regulations.

**D.     Defendants made or caused the making of false certifications and false records.**

90.     Raytheon certified its ability to comply with FAR, DFARS, and NIST 800-171 in connection with each contract's associated Statement of Work. As explained *supra*, Defendants' conduct violated FAR, DFARS, and NIST 800-171, rendering these certifications false.

91.     Defendants knew of Raytheon's noncompliance with FAR, DFARS, and NIST 800-171. Defendants initially failed to investigate or correct employees' reckless misunderstanding about whether these requirements even applied. Repeated refusal by DoD of "waiver clauses" gave Defendants constructive knowledge that this compliance was required and material. Even after this, however, Raytheon continued to falsely certify its compliance.

92.     Defendants also created or caused the creation of false records that furthered their fraudulent scheme. Specifically, Raytheon sent letters to DoD in May of 2020 that appeared to explain its noncompliance, but did not tell the whole story—furthering Defendants' fraudulent scheme. *See* Ex. 4, Noncompliance Letter Example. These letters were false records because: (1) they did not explain that DarkNet 2.0 would only be used for only some of the work at issue (leaving other work on the noncompliant and insecure original DarkNet); and (2) they provided a

27

timeline of September 2020 when Defendants had virtually no roadmap or timeline for compliance at that time. The new, compliant DarkNet 2.0 did not fully come online until March of 2021, but Defendants never corrected the inaccurate September 2020 estimate in the letters.

93.    Because some of the work at issue in this matter is still conducted in DarkNet (instead of DarkNet 2.0), Defendants continue to knowingly misstate and falsely certify their compliance with material requirements, rendering every resulting claim for payment under the contracts at issue false and/or fraudulent.

**E.    Defendants fraudulently induced the United States DoD to enter into and renew its contracts with Raytheon.**

94.    Raytheon certified its ability to comply with FAR, DFARS, and NIST 800-171 when executing each contract's associated Statement of Work. However, Defendants knew or should have known when doing so that Raytheon's systems were not compliant and could not comply with those requirements.

95.    Even back in July of 2019, Raytheon-internal PowerPoint presentations referenced the need for a new DarkNet (DarkNet 2.0) in order to become compliant. And, other Raytheon employees had already reported concerns about contractual violations of the DFARS clauses to the newly-appointed Individual 4. Individual 4 failed to take any action in response.

96.    Even after Raytheon started creating DarkNet 2.0 and improving compliance, it falsely told DoD that the problem would be solved around September of 2020. DFARS Net was used as a temporary compliant solution, but only for some of the work at issue. DarkNet 2.0 did not come online until March of 2021, but Defendants never notified DoD of this delay. As mentioned previously, Defendants also failed to tell DoD that some work never moved to DarkNet 2.0 and is still conducted in the original DarkNet.

97.     DoD repeatedly and unequivocally rejected Defendants' request for a "waiver clause" to exempt Raytheon from compliance with the regulations at issue. Defendants never explained to DoD that Raytheon wanted this clause because it had never been compliant in the first place, and elected instead to lie to DoD about Raytheon's noncompliance. *See* Ex. 1.

98.     DoD's refusal of the waiver clause shows that the requirements of FAR, DFARS, and NIST 800-171 were material, and that DoD would never have entered into or renewed the contracts at issue if it had known the extent of Raytheon's fraudulent noncompliance.

**F.     Defendants charged non-contract costs to Raytheon's contracts with DoD, in violation of FAR.**

99.     From at least 2011 to the present, Raytheon charged time its employees spent on non-contract-related tasks like employee performance evaluations as direct project time on DoD contracts, in violation of FAR.

100.    Relator learned of the practice in 2020 from Individual 7. Individual 1 represented to Relator that the practice was compliant because it benefitted the contracts' projects. However, charging these non-contract-related tasks to contracts violates FAR because these indirect, non-contract-related, non-necessary expenses are not allocable to a particular contract, and are therefore unallowable. *See* 48 C.F.R. §§ 31.201-2(a), 31.201-4.

101.    Relator investigated the issue further and confirmed with Raytheon's financial and contract departments that the practice was impermissible. Relator conveyed this information to Raytheon employees, and learned that this was the first official, correct guidance they had ever received on the subject. Prior to that, they had continued the practice for years based on Individual 1's incorrect advice. Individual 2 and Individual 3's employees had done the same, because the "three [individuals]" routinely collaborated and generally followed the same practices.

29

102.    Relator also worked with others to correct the previous year's time records and make them compliant. However, because this practice had continued for so many years unabated, it resulted in past submission and payment of false and/or fraudulent claims.

## VIII.    Retaliation Against Relator

103.    Defendant Raytheon Co. retaliated against Relator in response to his reports of and efforts to stop Raytheon's fraud against the United States DoD.

104.    Relator began working for Raytheon Co. in June 2019 as Special Assistant to the Vice President of the CODEX Division. In the last two months of 2019, Relator was promoted to Director of Engineering.

105.    In November of 2019, Relator learned that Raytheon was building a new DarkNet, referred to as "DN2" or "DarkNet 2.0," in order to come into compliance with DoD requirements. Only later would he learn that until the transition to DarkNet 2.0 was completed (in March 2021), Raytheon **was consistently and materially noncompliant** with NIST 800-171 and FAR/DFARS, despite certifying its compliance to DoD. To make things worse, some work in DarkNet was never moved to DarkNet 2.0 (and is therefore still performed in a noncompliant and insecure system).

106.    On January 27, 2020, Relator participated in a teleconference with Individual 2, Individual 6, and Individual 7. Relator learned that DarkNet was noncompliant with NIST 800-171. Relator learned that in Spring 2017, Raytheon CODEX had proposed—and DoD had rejected—a contractual clause that would exempt Raytheon from NIST 800-171 and FAR/DFARS cyber compliance. Individual 2 was dismissive of the importance of and need for compliance and claimed, incredibly, that Raytheon did not work with any Covered Defense Information ("CDI"). Relator learned that the compliance issue had been raised by Individual 6 and Individual 7 before, and discussed with Individual 3.

30

107.    That same evening, Relator spoke with Individual 4 about the teleconference. This conversation solidified Relator's understanding that Raytheon had not only failed to comply with FAR, DFARS, and NIST 800-171 for years, but had actively dismissed compliance concerns raised by Individual 6 and others.

108.    On January 28, 2020, Relator e-mailed Individual 4 to follow up on this conversation. *See* Ex. 2, E-mail between Relator & Individual 4 (Jan. 28, 2020), at 1. Relator reported: "[Individual 2] said we did not have any CDI [] and don't listen to contracting [but the] language seems clear to me." Ex. 2, at 1. Relator then quoted the definition of CDI in FAR. *Id.* Relator continued:

> [Individual 6] mentioned after the conversation that [Individual 2] knew we were not compliant and [Individual 2] told him previously that we didn't need to worry about it. . . . Given that more and more of our work will be on the DoD side **we need to press harder to become compliant** and not just be concerned about the contracts we currently have in place. . . .
> I am extremely concerned that two of our key leaders [Individual 2 and Individual 3] are resistant to change and this makes it even more difficult for me to do my job. This passive aggressive behavior . . . still exists and is further promulgating entitled, and even troublesome, behavior.
> I certainly recognize that being in compliance with our customer requirements is costly and viewed as a hindrance to performance **but aren't we legally liable to the contract terms**. . . .
> I recommend a meeting . . . with you to discuss the way ahead.

Ex. 2, at 1–2 (emphasis added). In short, after learning that compliance was deficient and that Raytheon was not performing as required by its federal contracts, Relator initiated efforts to remedy the situation.

109.    In early February of 2020, Individual 1, Individual 2, and Individual 3 again requested contractual "waiver clauses" that would exempt Raytheon from compliance with the new FAR/DFARS cybersecurity regulations related to NIST 800-171. DoD refused the waiver clauses again. Individual 1 directed Individual 7 to sign the contract and certify Raytheon's

31

compliance, even though Raytheon was clearly not compliant. Individual 7 called Relator and stated that she was not comfortable with what Individual 1 had directed her to do.

110.    On February 18, 2020, as part of preparation for a new federal contract, Individual 10 circulated some proposed language for a waiver clause to Relator, Individual 1, Individual 8, and Individual 9. *See* Ex. 1, E-mail between Relator, Individual 1, and Others (Feb. 18, 2020). Individual 10 wrote:

> Past experience has shown that this DFARS [waiver] clause will be rejected by the government. Before I send this document . . . I wanted to get your take on whether I should remove the information or insert an IT system that is compliant.

Ex. 1, at 2. In other words, he was inquiring whether he should seek a waiver from DFARS compliance (which DoD would likely reject). *See id.* Individual 1 responded, "Insert that our IT system is compliant[.] Don['t] take an exception." Ex. 1, at 1. In short, Individual 1 instructed Individual 10 to lie that Raytheon's systems were compliant. Relator replied, "How can we ethically do the following as stated below 'Insert that our IT system is compliant'. This continued attitude makes my job much harder." *Id.*

111.    On February 25, 2020, Individual 4 informed Relator that his salary would increase, and praised his performance. *See* Ex. 8, E-mail from Individual 4 Praising Relator (Feb. 25, 2020), at 1.

112.    Relator learned around this time that Raytheon not only had previously lied to DoD about its ability to provide compliant systems, but had never reported its noncompliance to DoD. Bit by bit, he gradually understood that Individual 1, Individual 2, and Individual 3 (the "three [individuals]") had actively suppressed noncompliance, claiming that NIST 800-171 didn't apply to Raytheon. Most Raytheon employees working underneath the "three [individuals]" did not have the technical knowledge to know that this was false, so the fraud had continued unabated for some

time. To make things worse, Individual 1, Individual 3, and Individual 2's superior, Individual 5, knew of or ignored their conduct, and failed to discipline them or permit others to do so.

113.     Around this time, Relator learned that Raytheon was charging time its employees spent on non-contract-related tasks like performance evaluations and training as direct project time on DoD contracts, in violation of FAR. Individual 1 told Relator that the practice was compliant because it benefitted the contracts' projects. Relator investigated further and confirmed with Raytheon's financial and contract departments that the practice was impermissible. Relator conveyed this information to Raytheon employees and worked to correct the prior year's time records and make them compliant.

114.     Raytheon employees began working from home in late March of 2020 due to the COVID-19 pandemic. The transition to DarkNet 2.0 was delayed, and Individual 3 authorized employees to go back to using DarkNet while working from home on a DoD project known as "Castles."

115.     On April 9, 2020, Individual 3 sent Relator, Individual 6, and Individual 7 "updated DFARS guidance" for the "Castles" project. Ex. 3, E-mail regarding Castles Contract (April 9–10, 2020), at 1. Individual 3 indicated that Raytheon had revised—and would not follow—an "'everything-must-be-DFARS [compliant]' approach." *Id.* Individual 3 advised that using Raytheon's existing, noncompliant DarkNet in combination with another system would suffice, and questioned whether Castles really required a DFARS-compliant environment. *See id.* Relator forwarded the message to Individual 4 and expressed concern that the CODEX leadership team had not been fully briefed on Individual 3's proposal or approved it. *Id.* In other words, it appeared that Individual 3 had directed the plan as he saw fit, without regard to compliance and without involving the required leadership. Individual 4 responded to Relator and dismissed his concerns:

33

"I am comfortable with [Individual 3's] approach as I see no reason not to be comfortable." Ex. 3, at 1.

116.    On April 16, 2020, Relator had a group telephone call with Individual 7, Individual 6, Individual 9, Individual 3, and Individual 11. The group reached an understanding that DarkNet was not FAR- or DFARS-compliant (and had no waiver for compliance, either). Relator learned that Raytheon was revoking DarkNet's "authority to operate." Ensuring compliance with proper administrative controls was discussed.

117.    On April 20, 2020, Individual 3 made recommendations via e-mail about administrative controls for DarkNet, which had not been approved by the IT or Engineering departments. Relator asked Individual 6 and Individual 11 to rewrite the recommendations in order to make them more compliant.

118.    Without any notice to Relator, in late May of 2020, Raytheon sent letters to its points of contact for the DoD contracts at issue, revealing DarkNet's noncompliance years after the fact:

> I am writing on behalf of Raytheon Cyber Solutions, Inc. ("RCSI") to notify you regarding the status of an information system, "Darknet," which RCSI uses to perform certain unclassified tasks on the . . . contract.
> RCSI uses Darknet as a development environment to perform unique and highly-specialized cyber services for its customers. Based upon an initial review, we believe that the Darknet information system is not in compliance with FAR 52.204-21.
> RCSI is committed to addressing this non-compliance. To that end, RCSI is in the process of developing a robust system environment, "Darknet 2.0," which will replace Darknet and will be designed to implement the NIST SP 800-171-based security requirements in the FAR clause. RCSI is currently focused on the timely implementation of Darknet 2.0 and is ready to discuss Darknet 2.0 status as well as certain interim measures being taken on the existing Darknet system. Based on the current projections, Darknet 2.0 is expected to be deployed in September 2020.

Ex. 4, Noncompliance Letter Example, at 1. At the time this letter was sent, there was no concrete plan in place for how to make a compliant DarkNet, nor was DarkNet 2.0 "expected to be deployed

in September 2020." *Id.* As a result, Raytheon furthered its fraudulent scheme by sending this letter.

119.    Due to the COVID-19 pandemic, the May 2020 noncompliance letter was likely not reviewed by the necessary personnel at DoD until later in 2020, by which time DoD would have assumed that DarkNet 2.0 was deployed and the compliance issue had been remedied. Raytheon never disclosed to DoD during Relator's employment that DarkNet 2.0 was not fully deployed until March of 2021.

120.    In mid-2020, Individual 2 verbally attacked Relator in front of Individual 4, blaming Relator for other employees' departure from Raytheon. Neither Relator nor any other Raytheon employee had any control over those departures, but [Individual 2] blamed Relator.

121.    As part of the employee evaluation process, on June 16, 2020, Relator reported some of his concerns, noting his protected activity to date:

> [T]o grow requires that we operate not only in a functional manner but also with integrity. I discovered that our [Darknet] network was not compliant and immediately raised that concern to [Individual 4]. I was a significant player in identifying solutions to satisfy FAR, D[F]ARS and ITAR policies even at great risk to myself given backlash from several members of the CODEX [leadership team]. However, the resulting changes will be both functional and compliant.

Ex. 5, Relator's Employee Evaluations, at 5.

122.    On June 16, 2020, Relator learned that DarkNet was removed from merger and acquisition information at Raytheon, and was being operated "off the books." Many believed that this had been done deliberately in order to continue using a known noncompliant solution on DoD contracts, purposefully continuing Raytheon's fraudulent scheme.

123.    On July 29, 2020, Relator learned that Individual 1, Individual 2, and Individual 3 had independently (with Individual 4's permission) developed a "strategic initiative to address CODEX Engineering issues" including "examining a revamp of the organization structure[.]" Ex.

35

6, E- mails between Relator, Individual 12, and Others (July 29–30, 2020), at 3. The proposed plan gave these three individuals more control, minimized Relator's involvement, and would therefore have perpetuated Raytheon's culture of noncompliance. The restructuring plan was supposed to include Individual 12's organization, but the "three [individuals]" decided not to.

124.    Relator was largely kept out of the loop on this proposal, but Individual 3 falsely told Individual 12 that he had been working with Relator on the solution. *See id.* Individual 12 expressed disappointment at being excluded from discussions. *See* Ex. 6, at 2.

125.    Relator forwarded communications from Individual 1 to Individual 4 on July 30, 2020 (copying Individual 12) and expressed concern that Individual 1, Individual 2, and Individual 3 were trying to preserve a culture of noncompliance:

> The below e-mail [from Individual 1] is disturbing. [Individual 1] is not accurate. . . . You have asked me to bring these occurrences to your attention so here is one more. When I brought up again about including [Individual 12] in this discussion they were dismissive using the reason that [Individual 12] is the C2 account exec so it did not affect her. I said [Individual 12] is responsible for one third of the CODEX workforce which is included in their design. If they had done as [Individual 1] stated below then they would not have touched base[] with [Individual 12] until after briefing you tomorrow. This logic makes no sense. It's disrespectful at the very least. . . . I am also not aware that the workforce is demanding a reorg[anization].
> Additionally, if there is a discussion of a reorg which [a]ffects CODEX, as this does, then shouldn't all of the [a]ffected leaders be included in the discussion?
> [Individual 12] and I previously presented an integrated approach to you and [Individual 13]. Ultimately, it was not implemented because the budget did not allow for it and it was decided to postpone any potential change until after we were closer to being awarded one of the large contracts we expect.
> I believe now is the wrong time for a reorg. . . .
> I again request your help in getting this behavior under control.

Ex. 6, at 1.

126.    On July 31, 2020, Relator learned that Individual 4 had falsely told another Raytheon department lead that Relator wanted to transfer to his department. Individual 4 had, however, told Relator that the other department lead initiated the conversation. It appeared that

36

Individual 4 wanted to transfer Relator as retaliation for reporting and trying to stop Raytheon's fraud.

127.    On August 12, 2020, Individual 4 told Relator that he needed to leave Raytheon if he did not trust Individual 2. Individual 4 conveyed to Relator that Individual 2 was not responsible for Raytheon's noncompliance, but this was at odds with what Relator and other employees had both observed and reported for years. Individual 4 told Relator that she had spoken to Individual 6 about Individual 2, but Relator confirmed with Individual 6 that this was false.

128.    On August 27, 2020, Relator e-mailed Raytheon's ethics department and reported Raytheon's failure to address his and other employees' concerns that Individual 1, Individual 2, and Individual 3 had caused Raytheon's ongoing noncompliance with laws and regulations and promulgated a belief that CODEX was exempt from "the rules." Relator expressed concern that Individual 3 was responsible for DFARS compliance when he had intentionally evaded it in order to reduce the CODEX engineers' work. Relator also reported Individual 4's actions on August 12 as retaliation for his reports of and efforts to stop fraud. Raytheon's ethics department spoke with Relator over the telephone after this e-mail.

129.    In September of 2020, Individual 4 removed Relator as Raytheon CODEX Director of Engineering. Individual 4's proffered reasons were: (1) she did not like the way that Relator communicated with engineers; and (2) her opinion that Relator did not know how to effectively manage a budget. In truth, federal government office closures during the COVID-19 pandemic had caused an unexpected decline in Raytheon CODEX's work and impacted budgets—but that was completely outside of Relator's control. Individual 4's opinion of Relator's communication style was likely an attack on his reports of and efforts to stop fraud on DoD; Relator had rightfully not had the best relationship with Individual 2 and others who continued to push Raytheon in an illegal

37

direction. The real reason for Individual 4's actions, it appeared, was to punish Relator for his protected activity.

130.    Individual 4 offered Relator a replacement position in Maryland which required relocation. Relator accepted the position. Raytheon Co.'s Human Resources department promised to increase Relator's salary to account for the higher cost of living in that area.

131.    Relator relocated and purchased a new home in Maryland. While Relator was reimbursed for relocation expenses, Raytheon never provided the promised cost-of-living salary adjustment.

132.    In Relator's "new" position, Individual 4 told him, he would take over Individual 12's duties while keeping his "Director of Engineering" job title under some new government contracts, and eventually become a Senior Manager of Cyber Security. When Relator came to Raytheon's Maryland office in December of 2020, however, he learned that the expected new contracts had never materialized. In fact, Individual 4 had never even confirmed which new position Relator would assume.

133.    In the meantime, there was very little work for Relator to do, as Individual 12 showed no indication of leaving her role. Relator's job transfer had, in short, decreased his compensation and resulted in de facto demotion to a dead-end position.

134.    It became increasingly apparent to Relator that he had been discriminated against in the terms and conditions of employment, as he waited for a future job that would never materialize.

135.    On December 18, 2020, Relator completed a year-end self-assessment as part of the employee evaluation process. Ex. 5, at 5–6. He noted that he had "[s]pent significant energy and time responding to numerous ethics complaints directed outside of engineering" and had

38

encouraged the DarkNet 2.0 team to add additional time to their estimates of when that system would be ready. Ex. 5, at 5.

136.    Relator resigned from Raytheon Co. not too long afterwards, feeling that he had essentially been forced out for his reports of and efforts to stop fraud.

137.    While working out his notice period, Relator was retaliated against yet again. On March 11, 2021, Individual 14 inadvertently sent Relator a message intended for another person, with disparaging comments about Relator. *See* Ex. 9. Messages from Individual 14 (Mar. 11, 2021). Individual 14 stated, "I think I called it with [Relator]. Collect his [pay] and leave. Not sell his house in Texas...We just give money away. We should have pushed him out before Jan[uary]." Ex. 9, at 1. After realizing his mistake, Individual 14 wrote "I'm sorry I sent this to you. Please call me to discuss." *Id.* Relator responded, "unfortunate that you speculate and spread rumors that are not the truth" and elected not to call Individual 14. *Id.* Raytheon Human Resources apologized to Relator for the incident.

138.    Raytheon Co. harassed and discriminated against Relator in the terms and conditions of his employment as a direct consequence of Relator's reports of and efforts to stop fraud against DoD.

## IX.    Actionable Conduct by Defendants

### A.    False Claims Act

#### 1.    Applicable Law

139.    This is an action to recover damages and civil penalties on behalf of the United States and Relator arising from the false and/or fraudulent statements, claims, and acts Defendants made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3732.

140.    The FCA provides that any person who:

39

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; or

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; or

(C)    conspires to defraud the Government by committing a violation of [the FCA]

is liable to the Government for a civil penalty of not less than $11,665 and not more than $23,331 for each such claim, plus three times the amount of damages sustained by the Government because of the false and/or fraudulent claim. 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

141.    The FCA defines "claim" as:

(A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(I)    provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. § 3729(b)(2).

142.    The FCA allows any persons having knowledge of a false or fraudulent claim against the Government to bring an action in federal district court for themselves and for the United States and to share in any recovery as authorized by 31 U.S.C. § 3730. The FCA also protects whistleblowers who have suffered retaliation because of their efforts to stop one or more violations of the False Claims Act. *See* 31 U.S.C. § 3730(h).

40

143.    Based on these provisions, Relator, on behalf of the United States and on his own behalf, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

## 2.    Defendants' Violations of the False Claims Act

### a.    Presentment or Causation of Presentment of False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

144.    From at least 2011 to the present, Defendants have knowingly presented or caused the presentment of false and/or fraudulent claims for payment or approval to the United States DoD, in connection with multiple federal contracts. Raytheon's claims for payment were rendered false and/or fraudulent because: (1) the contracts were fraudulently induced; (2) because of express false certifications; and/or (3) because they included unallowable overhead expenses.

145.    Defendants fraudulently induced DoD to enter into and renew contracts with Raytheon for cyber offense capabilities and services by falsely certifying (or causing false certifications of) Raytheon's ability to comply with FAR, DFARS, and the requirements of NIST 800-171 in executing Statements of Work connected to the contracts at issue.

146.    DoD relied on Raytheon's certifications of security-critical requirements when entering into and renewing its contracts. Separate and apart from fraudulent inducement, these false certifications are also actionable by themselves under the FCA.

147.    Defendants also charged (or caused charging of) unallowable, unallocable costs to Raytheon's DoD contracts, in violation of FAR. All claims submitted and paid under the contracts at issue that falsely included employee performance evaluation time as direct costs are false and/or fraudulent claims.

148.    Raytheon submitted claims for payment under the contracts at issue to DoD.

41

149.   Pursuant to 48 C.F.R. § 32.905(a), the basis for payment is on receipt of a proper invoice and satisfactory contract performance. Defendants caused the United States DoD to make payments for services that it would not have made had it known that Raytheon was materially noncompliant with required regulations.

150.   By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated Section 3729(a)(1)(A) of the False Claims Act.

151.   Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the government's payment decision and was material to the government's decision to pay the claims.

152.   Defendants' violations of FAR and DFARS (and resulting false certifications of compliance) were material because they went to the very essence of the bargain for which the United States DoD contracted. DoD believed it was paying for services provided in compliance with FAR and DFARS, which met the minimum cybersecurity requirements set forth in those regulations. In fact, DoD explicitly rejected Defendants' request to waive FAR/DFARS cybersecurity compliance.[5] Had DoD known of Defendants' failure to comply with FAR and DFARS, which resulted in the submission of ineligible claims for reimbursement, DoD would not have paid the claims.[6]

153.   Defendants' fraudulent representations or causation thereof earned Raytheon billions of dollars to which it was not legitimately entitled. The ultimate submission to DoD of false and/or fraudulent claims for payment was a foreseeable factor in DoD's loss and a consequence of the scheme.

---

[5] *See also United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1247–49 (E.D. Cal. 2019) (discussing materiality of compliance with DFARS cybersecurity regulations)
[6] *See id*.

42

154.    By virtue of Defendants' actions, the United States DoD has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false and/or fraudulent claim.

### b.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))

155.    From 2011 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims paid or approved by the United States DoD.

156.    These false statements and records include: (1) Raytheon's aforementioned false certifications or representations of compliance with applicable laws and regulations, including but not limited to FAR and DFARS, made in connection with each contract at issue and its Statement of Work; and (2) noncompliance letters transmitted in May of 2020 to DoD, *see* Ex. 4, which failed to reveal the full extent of noncompliance and Defendants' fraud, and which misrepresented the timeline for expected compliance. Contrary to these letters, Defendants never brought all of Raytheon's systems into compliance for the contracts at issue.

157.    Defendants' false statements and records were material because they went to the very essence of the bargain for which the United States DoD contracted. DoD believed it was paying for services provided in compliance with FAR and DFARS, which met the minimum cybersecurity requirements set forth in those regulations. In fact, DoD explicitly rejected Defendants' request to waive FAR/DFARS cybersecurity compliance for Raytheon.[7] Had DoD known of Defendants' false records and statements about FAR and DFARS compliance, which

---

[7] *See also United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1247–49 (E.D. Cal. 2019) (discussing materiality of compliance with DFARS cybersecurity regulations)

resulted in the submission of ineligible claims for reimbursement, DoD would not have paid the claims.[8]

158.    By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated Section 3729(a)(1)(B) of the False Claims Act.

159.    Defendants' material false statements and records (or causation thereof) had the potential to influence DoD's payment decision and were material to DoD's decision to pay the claims.

160.    Because of Defendants' fraudulent representations (or causation thereof), Raytheon earned billions of dollars to which it was not legitimately entitled. Defendants' false statements and records (or causation thereof) were foreseeable factors in DoD's loss and a consequence of the scheme. By virtue of Defendants' actions, the United States DoD has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false and/or fraudulent claim.

        **c.    Retaliation Against Relator (31 U.S.C. § 3730(h))**

161.    Section 3730(h) of Title 31 of the U.S. Code defines whistleblower protection under the FCA as follows:

> (1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of efforts to stop 1 or more violations of this subchapter. . . .

> (2) Relief … shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation

---

[8] *See United States v. Aerojet Rocketdyne Holdings, Inc.*, 381 F. Supp. 3d 1240, 1247–49 (E.D. Cal. 2019) (discussing materiality of compliance with DFARS cybersecurity regulations).

for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

31 U.S.C. § 3730(h).

162.    As discussed *supra*, Defendant Raytheon Co. retaliated against Relator as a result of his efforts to stop Raytheon from committing False Claims Act violations. Defendant Raytheon Co. punished Relator for his lawful and statutorily protected activity with harassment and discrimination in the terms and conditions of employment, including salary reduction and de facto demotion.

163.    Relator has suffered economic loss and sustained special damages as a result of Defendant Raytheon Co.'s retaliatory actions, and is entitled to relief pursuant to 31 U.S.C. § 3730(h).

## X.    Causes of Action

### A.    Count I – Presentation of False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

164.    Relators reallege and hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint.

165.    From at least 2011 to the present, Defendants have knowingly presented or caused the presentment of false and/or fraudulent claims for payment or approval to the United States DoD. Raytheon's claims for payment were rendered false and/or fraudulent because: (1) the contracts were fraudulently induced; (2) because of express false certifications; and/or (3) because they included unallowable overhead expenses.

166.    By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated the False Claims Act. *See* 31 U.S.C. § 3729(a)(1)(A).

167.    Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the United States DoD's payment decision and was material to DoD's decision to pay the claims.

168.    The United States DoD paid the false and/or fraudulent claims.

169.    The ultimate submission to DoD of false and/or fraudulent claims for payment was a foreseeable factor in DoD's loss and a consequence of the scheme.

170.    By virtue of Defendants' actions, the United States DoD has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false and/or fraudulent claim.

**B.    Count II – Making or Using False Records or Statements Material to False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))**

171.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

172.    From 2011 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims paid or approved by the United States DoD. These false statements and records include false certifications or representations of compliance with applicable laws and regulations and letters sent to DoD in May of 2020.

173.    By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated 31 U.S.C. § 3729(a)(1)(B).

174.    Defendants' false statements and records were material because they went to the very essence of the bargain for which the United States DoD contracted. Had DoD known of Defendants' false records and statements about FAR and DFARS compliance, which resulted in the submission of ineligible claims for reimbursement, DoD would not have paid the claims.

46

175.    The United States DoD paid the false and/or fraudulent claims.

176.    Defendants' false statements and records (or causation thereof) were foreseeable factors in DoD's loss and a consequence of the scheme. By virtue of Defendants' actions, the United States DoD has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false and/or fraudulent claim.

<u>PRAYER FOR RELIEF</u>

177.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants and award the following:

    (1)    Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

    (2)    Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

    (3)    The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

    (4)    All costs and expenses of this litigation, including attorney's fees and costs of court; and

    (5)    All other relief on behalf of Relator or the United States that the Court deems just and proper.

**C.    Count III – Retaliation (31 U.S.C. § 3730(h))**

178.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

179.    In violation of 31 U.S.C. § 3730(h), Defendant Raytheon Co. retaliated against Relator as a result of his efforts to stop Defendants from committing violations of the False Claims Act.

180.    Raytheon Co. punished Relator for his lawful and statutorily protected activity with harassment and discrimination in the terms and conditions of employment, including salary reduction and de facto demotion.

47

181. Relator has suffered economic loss and special damages as a result of Raytheon Co.'s retaliation.

PRAYER FOR RELIEF

182. WHEREFORE, Relator prays that the Court enter judgment against Defendant Raytheon Co. for the following:

(1) Reinstatement with the same seniority status;

(2) Two times the amount of Relator's back pay;

(3) Interest on Relator's back pay;

(4) Compensation for special damages sustained by Relator as a result of Defendant Raytheon Co.'s actions, including but not limited to compensatory damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss to reputation, and other pecuniary and nonpecuniary losses;

(5) Punitive damages;

(6) Litigation costs and attorney's fees;

(7) Prejudgment interest at the highest rate allowed by law; and

(8) Any other relief the Court deems just and proper to make Relator whole.

**XI.   Demand for Jury Trial**

183. Pursuant to Federal Rule of Civil Procedure 38, Relator demands a jury trial.

**XII.   Index of Exhibits**

184. The following exhibits are referenced herein:

| Exhibit No. | Description | Bates Range of Exhibit |
|---|---|---|
| 1 | E-mail between Relator, Individual 1, and Others (Feb. 18, 2020) | KFR000001–KFR000002 |
| 2 | E-mail between Relator and Individual 4 (Jan. 28, 2020) | KFR000003–KFR000004 |
| 3 | E-mail regarding Castles Contract (Apr. 9–10, 2020) | KFR000005–KFR000006 |
| 4 | Noncompliance Letter Example | KFR000007–KFR000008 |
| 5 | Relator's Employee Evaluations | KFR000009–KFR000015 |

| 6 | E-mails between Relator, Individual 12, and Others (July 29–30, 2020) | KFR000016–KFR000018 |
|---|---|---|
| 7 | NIST 800-171 | KFR000019–KFR000131 |
| 8 | E-mail from Individual 4 Praising Relator (Feb. 25, 2020) | KFR000132 |
| 9 | Messages from Individual 14 (Mar. 11, 2021) | KFR000133 |

Respectfully submitted,

**BERG & ANDROPHY**

*/s/ David Berg*
David Berg
State Bar No. 01254700
708 Main Street
Houston, Texas 77002
Mailing:
P.O. Box 803708
Houston, Texas 77280
Telephone (713) 529-5622
Facsimile (713) 529-3785

49

Confidential – Attorney–Client Privileged Work Product Containing
Attorney Opinions, Thought Processes and Mental Impressions

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2024, I caused a true and correct copy of this Amended Complaint to be served on the United States Department of Justice and the United States Attorney's Office for the District of Columbia via certified mail, return receipt requested.

I further certify that on October 24, 2024, a true and correct copy of this Amended Complaint was sent via electronic mail to Merrick Garland, United States Attorney General, at Civilfrauds.quitams@usdoj.gov.


*/s/ David Berg*
David Berg

# Sealed Document

The enclosed document is sealed pursuant to a federal court Order.

The document may not be disseminated beyond the limited distribution permitted by the Court